UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ELIZABETH RICHARDSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-00313-JAW |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration found that Elizabeth Richardson has severe mental and physical impairments, but retains the functional capacity to perform substantial gainful activity in occupations existing in significant numbers in the national economy, resulting in a denial of Richardson's application for supplemental security income under Title XVI of the Social Security Act. Richardson commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court vacate the decision and remand for further proceedings related to the mental retardation listing and the existence of occupations that Richardson might perform.

**The Administrative Findings**

The Commissioner's final decision is the May 27, 2010, decision of the Decision Review Board, which "found no reason" to disturb the decision of Administrative Law Judge Virginia Kuhn. The Commissioner rests, in effect, on the February 24, 2010, decision issued by Judge Kuhn. Judge Kuhn's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims. (Docs. Related to Admin. Process, Doc. No. 11-2, R.

1-2, 8-20.[1])

At step 1 of the sequential evaluation process, the Judge found that Richardson has not engaged in substantial gainful activity since January 9, 2008, the date of alleged onset of disability.  (Finding 1, R. 10.)

At step 2, the Judge found that Richardson has the following severe impairments: borderline intellectual functioning, post-traumatic arthritis of the right ankle, moderate obstructive airway disease, pyruvate kinase deficiency, dysthymic disorder, and substance abuse in remission.  The Judge found pelvic inflammatory disease and other physical conditions to be non-severe.  She also found an alleged anxiety disorder to be unreliably diagnosed by a social worker, a non-acceptable medical source for purposes of initial diagnosis.  (Finding 2, R. 10-11.)

At step 3, the Judge found that this combination of impairments would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P.  As for mental listings, a subject of the instant litigation, the Judge specifically considered listings 12.02, 12.04, 12.05, and 12.09.  The Judge's discussion began with a rejection of the mental retardation listing (12.05), concluding that Richardson "does not have the requisite deficits of adaptive functioning for a diagnosis of mental retardation."  (Finding 3, R. 11.)  She reasoned that such deficits could not be present because Richardson "lives independently with her husband and child, drives, cares for her daughter, successfully completed adult education classes toward her GED, makes simple meals, does laundry, volunteers at a soup kitchen, and runs errands for the soup kitchen."  (Id.)  As part of this finding, the Judge also indicated that "there is no medical evidence during the relevant period diagnosing the claimant with mental retardation."  (Id.)  Thereafter, the Judge considered listing 12.02 (organic mental

---

[1]     The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 11.

disorders), 12.04 (affective disorders), and 12.09 (substance addiction disorders) and rejected them based on an application of the "special technique" which found no "marked" restrictions or difficulties, though "moderate" difficulties were found in relation to social functioning and concentration, persistence, and pace. (R. 11-12.) The Judge did not discuss how these moderate difficulties would relate back to the "adaptive functioning" component of subsection C of the mental retardation listing, which listing she had already rejected based on the existence of a certain measure of adaptive ability. The Judge did not cite any prior expert application of the special technique, though she did make independent reference to selected portions of the medical records.

Preliminary to further evaluation at steps 4 and 5, the Judge assessed Richardson's residual functional capacity (RFC). The Judge found that Richardson's combined impairments result in a restriction to light-duty work that is routine, repetitive, non-complex/detailed, limited to verbal and demonstrated instructions, and requires no reading, no more than brief and superficial contact with supervisors and coworkers, no interaction with the public, and no exposure to pulmonary irritants. (Finding 4, R. 13.) The Judge evaluated Richardson's individual impairments at some length and ultimately concluded that Richardson's subjective complaints exceed what she reported to care providers, what would be expected from the objective medical evidence, and what was reflected by Richardson's general level of functioning. (R. 14-17.) The Judge also viewed negatively certain failures by Richardson to follow treatment advice. (R. 17.) The Judge was generally dismissive of contrary views expressed by a social worker who testified on Richardson's behalf. (R. 14, 17.) A poor work history added to the negative credibility assessment. (R. 18.) For mental impairments, the Judge relied in part on a consulting psychiatric examination by Dr. Roger Ginn, Ph.D. The Judge's residual functional

capacity findings are generally supported by the psychiatric review techniques and the physical residual functional capacity assessments of record, though the Judge made findings of a greater degree of limitation than the consulting experts assessed. (Id.) On the other hand, there is no evidence that a consulting expert ever performed the psychiatric review technique subsequent to the introduction of multiple records containing IQ testing and related cognitive assessments.

At step 4, the Judge found that Richardson has no past relevant work or transferable skills to consider. (Findings 5, 8, R. 19.)

Richardson was born in 1980, has a limited education, and can communicate in English. (Findings 6, 7, R. 19.) Based on this vocational profile and the residual functional capacity finding, the Judge found at step 5 that Richardson would be able to engage in substantial gainful employment, including in the representative occupations of hand packer, production worker, and production inspector. (Finding 9, R. 19-20.) This finding is supported by vocational expert testimony, assuming that the residual functional capacity finding is sustainable. (Hr'g Tr. 31-33, R 53-55, Doc. No. 11-2.) However, there is a problem that arises concerning the identified jobs and the residual functional capacity restriction related to reading, as discussed below.

### Discussion of Plaintiff's Statement of Errors

Richardson argues that the Judge erred in her failure to find a listing-level impairment under the mental retardation listing and that the residual functional capacity finding is erroneous due to the failure to factor in memory loss and associated communicative limitations, certain notes from a counselor, and disabling fatigue. Additionally, Richardson alleges that the vocational expert's testimony conflicted with the Dictionary of Occupational Titles because the identified jobs would require reading. (Statement of Errors, Doc. No. 15.)

The standard of review is whether substantial evidence supports the Commissioner's

findings.  42 U.S.C. §§ 405(g), 1383(c)(3);  Manso-Pizarro v. Sec'y of Health & Human Servs.,

76 F.3d 15, 16 (1st Cir. 1996).  Substantial evidence is evidence that a reasonable mind might

accept as adequate to support a finding.  Richardson v. Perales, 402 U.S. 389, 401 (1971);

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  "The ALJ's

findings of fact are conclusive when supported by substantial evidence, but they are not

conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted

to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

## A.  Evidence

Richardson's medical records divulge a number of significant impairments.  Richardson

has a sinus problem secondary to past cocaine abuse.  She has been described as having

borderline intellect and mild mental retardation in some areas of cognition.  She fractured her

right ankle in a November 1997 auto accident and has resulting arthritic pain.  She also suffered

a left femoral head fracture that was treated with a drug-induced coma and, possibly, has resulted

in decreased short-term memory.  She also has dysthymia, obstructive airway disease, and

Pyruvate Kinase deficiency.  Richardson no longer has her spleen or her gall bladder.  (Exs. 1F-

5F.)

As for cognitive functioning, there is a June 1997 psychological report from Franklin

Thompson, Ed.D., who evaluated Richardson when she was in tenth grade for academic

programming purposes.  (Ex. 16F.)  Dr. Thompson evaluated Richardson's intellectual quotient

as follows:  a verbal IQ of 80 (+/- 5);  a performance IQ of 69 (+/- 9);  and a full scale IQ of 74

(+/- 5).  (R. 622.)  Dr. Thompson classified Richardson's overall performance as being in the

"borderline range" and described the performance factor as within the "borderline deficient

range."  (R. 623.)  In relation to Richardson's ability to think and solve problems in nonverbal,

abstract and conceptual terms, Dr. Thompson found a "mildly retarded range of ability." (Id.) According to his report: "Mechanical skills, manual dexterity, speed and accuracy, are all reflected in this factor." (Id.) Testing factors also indicated "poor ability with tasks involving sustained attention, short term memory and concentration." (Id.)

On April 9, 1998, following a severe auto accident and head fracture, Richardson underwent a neuropsychological evaluation at the Maine Head Trauma Center, which evaluation included some IQ testing. (Ex. 17F.) This evaluation produced a diagnosis of traumatic brain injury. The psychosocial history noted early problems with the law, including a stint on probation at age 13 for striking a police officer and subsequent troubles adhering to the terms of probation, problems with authority figures, and a history of alleged sexual abuse by her biological father. (R. 632.) According to the report, "a depression scale indicated the presence of depression." (R. 634.) All of these issues were manifested prior to age 22. The assessment of intellectual functioning included the Wechsler Adult Intelligence Scale, third edition (WAIS-III), and Richardson's IQ scores were reported as 81 verbal, 74 performance, and 77 full scale, with a description of these results as within the "borderline range." (R. 634-35.)

Maine Disability Determination Services reviewed Richardson's medical records in March 2008 and again in July 2008. In the first round of reviews, both psychiatric and physical conditions were assessed as non-severe. (Exs. 6F, 7F.) In the second round, psychiatric conditions were again assessed as non-severe, but some exertional and postural limitations were recognized. (Exs. 10F, 11F.) Dr. Robert Hayes, DO, opined that Richardson would be able to manage 50 pounds occasionally and could stand or walk for six hours in a workday. (Ex. 11F.) The Hayes RFC serves as the final physical RFC assessment of record, other than the Judge's RFC finding.

It is important to note that, although the expert reviews of record (particularly the psychiatric review techniques) transpired after Richardson's childhood IQ testing, the records related to her childhood testing and brain injury were not part of the record when the psychiatric review techniques were performed. Both the Thompson report and the Maine Head Trauma Center report entered the record subsequent to the assessments performed by the consulting experts in 2008.

In July 2009, Maine DDS referred Richardson for a consultative examination by Roger Ginn, Ph.D., presumably in recognition of the significance of the newly-introduced records of IQ testing. Dr. Ginn performed a psychological assessment involving a review of available records, a clinical interview, and a mental status assessment, including a Wechsler Adult Intelligence Scale-III. (Ex. 19F.) Richardson appeared for the interview and testing with an illness, indicating that she was suffering from pneumonia. (R. 667.) According to Dr. Ginn, Richardson did not give her best effort or concentration to the testing. (R. 668.) On the WAIS-III Richardson scored a verbal IQ of 70, a performance IQ of 67, and a full scale IQ of 66. According to Dr. Ginn, the last score is in the mild mental retardation range. (Id.) Dr. Ginn found Richardson's working memory to be poor and opined that she would only be able to remember "very simple" job tasks. (R. 668-69.) He also predicted "significant difficulties with reading and spelling." (R. 669.) Dr. Ginn also assessed mild-to-moderate dysthymia. (Id.) In addition to this report, Dr. Ginn submitted a medical assessment of ability to do work-related activities (mental). (Ex. 20F.) Flagging limited IQ, Dr. Ginn assessed a moderate degree of limitation in use of judgment, marked limitation in regard to complex job instructions, moderate limitation in regard to detailed but not complex instructions, and slight limitation with simple instructions, though he had previously indicated a restriction to "very simple" job tasks. (R. 671-

72.)  Dr. Ginn did not submit an opinion related to the listings, which would ordinarily be supplied on the Commissioner's psychiatric review technique form.  There is no medical expert opinion evidence of record related to how the record measures up to, in particular, listing 12.05, subsection C.

At the administrative hearing, a vocational expert identified three occupations that the Judge found Richardson could perform.  These three occupations and their Dictionary of Occupational Titles code numbers are:  hand packer (920.687-166 or 737.687-094), production worker (920.587-026 or 726.687-042), and production inspector (733.687-062 or 762.687-014).  All of these production-rate[2] jobs entail a general educational development enabling at least "level 1" reading, which calls for reading at a rate of 95-120 words per minute.  The first of the two "production worker" jobs requires "level 2" reading, which is more demanding, and the second specifically references a need to maintain production records.  The first of the two inspector jobs also indicates the possible need to maintain records.  The latter requires level 2 reading.

## B.  Discussion

The spearhead of Richardson's statement of errors presents a bid for a finding of "disabled" at step 3 based on application of listing 12.05(C) for mental retardation.  Otherwise, Richardson's allegations of error concern the Judge's residual functional capacity finding and whether she would be able to perform the occupations identified at step 5, in light of proposed additional limitations or in light of established reading difficulties.  The Commissioner filed a memorandum of law in this case to address this Court's past interpretation of the mental retardation listing and to request that the Court recognize and enforce a revised regulatory

---

[2]     Richardson has not raised here the suitability of production-rate jobs for someone described as mildly mentally retarded in relation to mechanical skills, manual dexterity, speed and accuracy (Dr. Thompson) or as limited to "very simple" jobs (Dr. Ginn), though it does jump off the page, so to speak.

construction of that listing. (Def.'s Mem., Doc. No. 22.) In another case argued this quarter, Magistrate Judge John Rich has recommended that the Court construe the listing in the manner requested by the Commissioner. Libby v. Astrue, No. 2:10-cv-292-JAW (D. Me. July 19, 2011) (Rich, Mag. J. Report and Recommendation). I am in agreement with that recommendation and have applied the Commissioner's listing as specified in the Code of Federal Regulations and clarified in the Federal Register, referenced below.

As for Richardson's statements of error, I find that the Judge's conclusions concerning the mental retardation listing lack substantial evidentiary support, particularly in the form of underlying expert opinion. Richardson's additional arguments also merit further evaluation on remand. In particular, the tension between the "no reading" residual functional capacity finding and the Dictionary of Occupational Titles definitions for the identified jobs independently justifies a remand order.

1.     *The mental retardation listing*

Impairments identified as "severe" at step 2 of the sequential evaluation process are measured against the Commissioner's Listing of Impairments, at step 3, to determine whether they are severe enough to automatically qualify the claimant as disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d); see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (describing satisfaction of a listing as calling for a conclusive presumption of a disabling impairment); Singh v. Apfel, 222 F.3d 48, 451 (8th Cir. 2000) ("If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience."). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v.

Zebley, 493 U.S. 521, 530 (1990).

In this case, Richardson contends that the record conclusively establishes that she meets

listing 12.05, subsection C, which requires proof of the following:

> 12.05 Mental retardation:  Mental retardation refers to *significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period*;  i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P, § 12.05(C) (emphasis

added).  In addition to these listing criteria, introductory language concerning the mental listings

offers the following explanation concerning the mental retardation listing:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.  . . .  For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.  . . .

Id. § 12.00(A).  Based on this listing language, subsection C of the mental retardation listing

requires proof of three elements:

10

(1)     Deficits in adaptive functioning initially manifested before age 22;

(2)     A valid verbal, performance, or full scale IQ of 60 through 70;  and

(3)     A physical or other mental impairment imposing an additional and
        significant work-related limitation of function.

See Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg.

20018, 20020 (Apr. 24, 2002);  Revised Medical Criteria for Evaluating Mental Disorders and

Traumatic Brain Injury, 65 Fed. Reg. 50746, 50776 (Aug. 21, 2000);  Morales v. Comm'r of

Soc. Sec., 2 Fed. Appx. 34, 37 (1st Cir. 2001) (not for publ'n);  Randall v. Astrue, 570 F.3d 651,

660 (5th Cir. 2009);  Wall v. Astrue, 561 F.3d 1048, 1062 (10th Cir. 2009);  Novy v. Astrue, 497

F.3d 708, 710 (7th Cir. 2007));  Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006);  Foster v.

Halter, 279 F.3d 348, 354-55 (6th Cir. 2001).  For a more extended discussion concerning the

first prong of the mental retardation listing and a discussion of this Court's precedent, reference

should be made to Magistrate Judge Rich's recommended decision in Libby, *supra*.

The Commissioner's memorandum of law does not address the facts of Richardson's case

or the findings of the Administrative Law Judge, only the legal basis for overturning this Court's

precedent on the mental retardation listing.  At oral argument, discussion focused on whether or

not the record in this case demonstrates deficits in adaptive functioning manifesting prior to age

22.  Both parties recognized that the record establishes the existence of the third element, *i.e.*,

additional and significant work-related limitation of functioning.  Less clear is whether the Judge

recognized that Richardson had valid qualifying IQ scores.  I address these questions in turn.

a.  Deficits in adaptive functioning manifested before age 22

The Judge concluded that Richardson did not meet listing 12.05(C) based on the absence

of "the requisite deficits in adaptive functioning."  (R. 11.)  Before discussing the evidence the

Judge relied on to make this finding, it is necessary to determine what the standard requires.

"Adaptive functioning" is ordinarily associated with activities of daily living. The Commissioner's preamble to the listings of mental disorders defines activities of daily living to "include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Listing 12.00(C)(1). In addition to these examples, the Commissioner has indicated that the regulations would allow for consideration of "any of the measurement methods recognized and endorsed by the professional organizations," 67 Fed. Reg. at 20020, including a consideration of demonstrated deficits in "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety," 67 Fed. Red. at 20022 (quoting the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)). In a nut shell, the standard requires an assessment of a claimant's ability to appropriately engage in day-to-day activities of independent living.

Listing 12.05(C) also calls for a consideration of whether a claimant's deficits in adaptive functioning were manifest prior to age 22. In recognition of the fact that an administrative record will not always allow for meaningful assessment of a claimant's adaptive functioning in childhood (other than through claimant's testimony), courts have generally allowed administrative law judges to draw inferences about childhood functioning based on evidence related to functioning in adulthood.[3] See, e.g., Monroe v. Astrue, 726 F. Supp. 2d 1349, 1355 (N.D. Fla. 2010) ("If a claimant has been able to adapt in functioning after age 22, it is

---

[3]     As Magistrate Judge Rich states in his Libby recommendation: "Courts . . . have considered evidence of a claimant's current adaptive functioning relevant to, and even dispositive of, the question of whether that definition is satisfied." Libby Report and Recommendation at 18 (affirming denial of benefits where consulting experts differed about claimant's satisfaction of the requirements of listing 12.05(C) and the record indicated that the claimant could drive, cook, clean, care for her disabled husband, babysit her grandchildren, go out for Bingo and dancing, play cards, manage a checkbook, write a shopping list, and care for pets).

permissible to find that Listing 12.05C has not been met.") (footnote omitted) (collecting cases); Anthony v. Astrue, No. 1:10-cv-00136-DML-JMS, 2011 U.S. Dist. Lexis 75307, *15-17, 2011 WL 2728059, *4-5 (S.D. Ind. July 12, 2011) (remanding for consideration of deficits in adult functioning, as well as adult adaptive functioning). This is to be expected, as the inquiry seeks evidence of *existing* deficits in adaptive functioning, albeit existing deficits that manifested prior to age 22.

The Judge found that Richardson's level of functioning in adulthood supported a finding that she did not suffer deficits in adaptive functioning presently or, inferentially, prior to age 22.

> [T]he claimant does not have the requisite deficits of adaptive functioning for a diagnosis of mental retardation. . . . The claimant lives independently with her husband and child, drives, cares for her daughter, successfully completed adult education classes toward her GED, makes simple meals, does laundry, volunteers at a soup kitchen, and runs errands for the soup kitchen (Exhibits 3E, 4E, 4F, 8F, 14F, 27F).

(R. 11.) The Judge offered some elaboration on this assessment in conjunction with her consideration of other possible listings. She noted that Richardson has volunteered at the soup kitchen for as much as two days per week, four hours at a time, and that this volunteer work includes running errands such as picking up mail or food from donors. She also noted that Richardson has successfully completed an intensive outpatient group therapy program for chemical dependence. However, the Judge also noted short-term memory deficits and a limited ability to follow instructions.[4] (R. 12.) Moreover, the Judge assessed a moderate degree of social limitation and a moderate degree of difficulty in concentration, persistence, and pace. Although these assessments were offered in relation to other listings, those listings include 12.02, which relates to "organic mental disorders." Recall that Richardson experienced a traumatic brain injury in 1997, when she was 17 years of age. It can be assumed that this injury was not

---

[4]     Elsewhere, the Judge observed that Richardson was able to understand and follow directions during IQ testing. (R. 15.)

the origin of her marginal intellectual functioning because Dr. Thompson administered the IQ test in June 1997 and the traumatic brain injury arose from an auto accident in November 1997. As of June, Dr. Thompson had already described Richardson as having an ability to think and solve problems in the "mildly retarded range of ability," which assessment also extended to mechanical skills, manual dexterity, speed and accuracy. (R. 623.)

Richardson argues that the evidence calls for a finding of deficits in adaptive functioning because she experienced significant deficits in academic performance before age 22 and also in the social aspects of school. In addition, Richardson denies being able to effectively read. She also alludes to her physical impairments, referencing the 1997 auto accident that caused her ankle fracture, brain injury, and allegedly her respiratory, mood, and anxiety symptoms. (Statement of Errors at 5-6.) The Judge has found the ankle fracture to result in a severe impairment. The Judge also found the pyruvate kinase deficiency to be another severe impairment. These impairments were all in place prior to age 22, but the Judge failed to discuss whether they would have caused any deficits in adaptive functioning. The Judge also found a severe dysthymic disorder and there is evidence that this disorder is also longstanding, as it appears in the report of the Head Trauma Center. Note that listing 12.05 does not require "significant" deficits in adaptive functioning, only deficits. Parenthetically, it can be presumed that all of Richardson's long-standing severe impairments cause deficits in vocational functioning. What their relationship is to "adaptive" functioning remains an open question. I note that no consulting expert has performed the Commissioner's psychiatric review technique (PRT) subsequent to the entry on the record of Dr. Thompson's psychological report, the Head Trauma Center report, and Dr. Ginn's consultative examination report, though Dr. Ginn did offer a mental residual functional capacity assessment on a more limited form than is ordinarily used

by consulting experts.  In any event, the PRT form is the form on which the listings are ordinarily evaluated by the consulting experts.  Given that no consulting expert ever truly offered an opinion on listing 12.05(C), the record should be referred to a consulting expert for performance of the PRT prior to the Judge's independent assessment of listing 12.05(C).  The Commissioner's regulations ordinarily require the assistance of an expert consultant, but such assistance can be dispensed with when it comes to common-sense judgments about functioning.  Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990);  see also Stambaugh v. Sullivan, 929 F.2d 292, 296 (7th Cir. 1991) ("[T]he regulations do severely limit proceeding without a medical advisor and seem to presume that an ALJ has before him expert evaluation of the mental impairment.").[5]  In this case, Dr. Ginn performed a consulting examination that included renewed testing on the WAIS-III, but, remarkably, Dr. Ginn neglected to complete the PRT form that calls for a distinct assessment of the Commissioner's listings for mental impairments.  Dr. Ginn did offer some potentially relevant opinions on his mental residual functional capacity form, but those findings do not fully overlap with the elements of the

---

[5]     See 20 C.F.R. §§ 416.920a(a) ("[W]hen we evaluate the severity of mental impairments for adults . . . when Part A of the Listing of Impairments is used, we must follow a special technique at each level in the administrative review process."), 416.920a(d)(2) ("If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder.  We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder."), 416.920a(e)(1) ("A State agency disability examiner may assist in preparing the standard document [at the initial or reconsideration level].  However, our medical or psychological consultant must review and sign the document to attest that it is complete and that he or she is responsible for its content, including the findings of fact and any discussion of supporting evidence.").

        The Commissioner's regulations about the degree of expert review are not crystal clear, but routinely the performance of the special technique by a consulting expert on the PRT form is precisely how substantial evidence in support of a mental listing determination comes into the record.  For example, the presence of such evidence has been cited as substantial evidence in the Court's review of two recent cases involving the mental retardation listing, Libby v. Astrue, No. 2:10-cv-292-JAW (Rich, Mag. J., Report and Recommended Dec. July 19, 2011) and Bard v. Astrue, No. 1:10-cv-220-JAW (Rich, Mag. J., Report and Recommended Dec. June 27, 2011).  In this case, the PRT forms of record do not indicate that any intellectual testing reports were ever reviewed by a consulting expert for purposes of making a listing determination.  Indeed, the only PRT forms on record entered the record before the intellectual testing reports did.  By comparison, in Bard, for example, notations at the end of the PRT forms reflect that the experts reviewed reports associated with IQ testing when they assessed the listing criteria. This case lacks comparable expert opinion evidence.  There is no PRT form of record (or medical expert testimony) that measures Richardson's intellectual testing against the 12.05(C) standard.

mental retardation listing and were not, in any event, fully embraced by the Judge in her residual functional capacity finding. In this particular presentation, Dr. Ginn's report and mental residual functional capacity opinion do not supply substantial evidence in support of the Judge's mental retardation listing determination.

Beyond the concern over the PRT void in the expert opinion of record on the mental retardation listing issue, there is an additional concern related to the Judge's *brevis* discussion of the mental retardation listing. The Judge summarily found that deficits in adaptive functioning were not demonstrated based on the presence of a subset of relative adaptive abilities. However, the presence of certain, relative[6] adaptive abilities does not rule out the presence of deficits in other areas of adaptive functioning. One additional concern is that, by the time the Judge herself applied the special technique in her decision, she had already rejected the mental retardation listing. It would have been more appropriate to consider the listing in light of the special technique which, after all, did indicate moderate difficulties in social functioning and in concentration, persistence, and pace.[7] Durden v. Astrue, 586 F. Supp. 2d 828, 840 (S.D. Tex. 2008) (calling for the mental retardation listing issue to be discussed in light of the special technique and for the Judge to articulate the standard being imposed for purposes of deficits in adaptive functioning). The identified social deficits, in particular, might combine with academic and reading deficits to demonstrate the requisite deficits in adaptive functioning. At present, the Judge's application of the mental retardation listing is limited to reciting what Richardson can do, without discussing evidence on the other side of the ledger, including the adaptive

---

[6]     The mere ability to perform some work in the past is not especially demonstrative of the absence of deficits in adaptive functioning. Here the record indicates the absence of substantial gainful activity, yet the Judge ultimately treated this fact as a negative factor in a credibility assessment associated with her eventual residual functional capacity finding. Also, it is not clear how volunteering once or twice weekly for a morning or afternoon warrants an inference that deficits in adaptive functioning are not demonstrated.

[7]     The Judge assessed only mild deficits in activities of daily living, which is more consistent with her finding concerning adaptive functioning, though the nature of the mild deficits is not identified.

implications of "moderate" social difficulties and multiple "severe" impairments that were manifested before age 22.

### b. IQ scores and the asserted absence of a "diagnosis"

In her decision, the Judge alluded to Richardson's IQ scores three times, but never indicated what the scores were or offered a finding whether the scores are qualifying scores for purposes of a mental retardation finding. To meet listing 12.05(C), the IQ score must be 60 through 70. The Commissioner's regulations provide: "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." Id. § 12.00(D)(6).

Richardson's childhood testing results included a performance IQ of 69. Dr. Thompson's narrative comments associated with the test described a borderline patient, but comments concerning problem-solving subtests and mechanical skills reported a "mildly retarded range of ability." (R. 622.) There is no indication that the score is not valid. Testing of Richardson in 2009 returned scores of 70 (verbal), 67 (performance), and 66 (full scale), all meeting the listing. (R. 667-68.) According to Dr. Ginn, he received a "fair" effort from Richardson, but not her best. (R. 668.) Still, Dr. Ginn indicated that Richardson's performance was consistent with the earlier test results. (Id.) Perhaps he meant the Head Trauma Center test results. It is not clear. No expert of record has both reviewed these medical records and offered an opinion on the validity of the scores that fall in the listing range.[8]

The Judge described Richardson's IQ scores as "borderline IQ scores" and found that the record lacked any evidence of a diagnosis of mental retardation. (R. 11.) Elsewhere, however, she assessed a moderate degree of impairment in concentration, persistence, and pace,

---

[8]       There was no medical expert testimony at the administrative hearing.

"acknowledg[ing] the IQ test scores achieved during the testing in Exhibits 16F and 17F." (R. 12.) Exhibit 16F is the Thompson IQ test of June 1997. Exhibit 17F is the post-accident neuropsychological examination of April 1998, in which every score exceeded 70. In making her residual functional capacity finding, the Judge spoke once more of "borderline IQ scores," noting that Richardson's performance in 2009 was impacted by asthmatic bronchitis. (R. 15.)

Based on my review of the record, I fail to see why Richardson's IQ scores necessarily fail to satisfy the listing. Because the Judge failed to discuss whether the scores were valid, I assume that she accepted the scores for purposes of her existing decision. However, I am a little concerned by the Judge's additional emphasis on whether there is an existing diagnosis of mental retardation in the record. (R. 11.) It might as readily be said that no expert has diagnosed the nonexistence of mental retardation. Certainly experts have noted testing results in the "mild mental retardation" range and others in the "borderline" range. The fact that an IQ score of 69 or 70 can fairly be described as "borderline" does not mean that it cannot partially satisfy the mental retardation listing. The listing describes mental retardation as "significantly subaverage general intellectual functioning" and the reports of Dr. Thompson, the Maine Head Trauma Center, and Dr. Ginn appear to report just that. Ultimately, the application of the mental retardation listing on this record appears to turn entirely on the adaptive functioning issue, absent some contrary input from a medical expert. Thus, for present purposes, the determination of that question determines whether Richardson meets the mental retardation listing.[9] The existence or nonexistence of a "diagnosis" of mental retardation is not an element of the listing analysis. The Judge's partial reliance on the absence of a diagnosis is, therefore, another erroneous finding, although it would not independently warrant a remand order if not for the problems with the

_____

[9]       As previously indicated, the Commissioner does not dispute that Richardson has an additional severe limitation that would satisfy the third element of the listing 12.05(C) standard.

adaptive functioning analysis and the absence of an underlying expert application of the Commissioner's special technique.

2.    *Residual functional capacity arguments*

Richardson alleges additional errors in the Judge's failure to include communicative, memory, and fatigue limitations in her residual functional capacity finding and in the Judge's assessment of whether certain treatment notes were of record.  (Statement of Errors at 7-10.) Given the recommendation that a remand take place for expert evaluation and further discussion of the mental retardation listing, these additional issues will presumably be reviewed by one or more experts in connection with performance of the PRT and the assessment of mental residual functional capacity.[10]  Such expert assessments may or may not reinforce the Judge's existing finding and it would be preferable for the Judge to have an opportunity to reconsider these contentions with the benefit of an expert evaluation, without the Court presuming to prejudge the issues.

3.    *Reading ability and substantial gainful activity*

Richardson maintains that the vocational expert's testimony was inconsistent with the Dictionary of Occupational Titles because she has reading difficulties and the DOT's descriptions of the identified occupations call for the worker to read or mark case/lot numbers, record production data, and/or maintain production records.  The Judge's existing residual functional capacity finding includes the preclusion of jobs requiring reading or spelling.  (R. 13.)

At step 5, the burden shifts to the Commissioner to demonstrate that a significant number of jobs exist in the national economy that the claimant could perform.  20 C.F.R. §§ 404.1520(g),

---

[10]    An exception exists in relation to fatigue, which might evade further psychiatric review, in part, given its alleged relationship to both anxiety/lack of sleep and the Pyruvate Kinase deficiency.  However, as for anemia associated with the latter disease, the Judge cited substantial evidence contradicting Richardson's allegations of disabling fatigue.  (R. 15-16.)

419.920(g); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987); <u>Goodermote v. Sec'y of Health & Human Servs.</u>, 690 F.2d 5, 7 (1st Cir. 1982). Ordinarily, the Commissioner will meet the step 5 burden, or not, "by relying on the testimony of a vocational expert" in response to a hypothetical question whether a person with the claimant's RFC, age, education, and work experience would be able to perform other work existing in the national economy. <u>Arocho v. Sec'y of Health & Human Servs.</u>, 670 F.2d 374, 375 (1st Cir. 1982). At hearing the Commissioner must transmit a hypothetical to the vocational expert that corresponds to the claimant's RFC. <u>Id.</u>

The Commissioner's rulings and regulations anticipate that the testimony of a vocational expert will be consistent with information supplied in the Department of Labor's Dictionary of Occupational Titles (DOT). The Commissioner has a policy of relying "primarily on the Dictionary of Occupational Titles (including its companion publication, the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)]" to classify the various characteristics of occupations. Soc. Sec. Ruling 00-4p, 2000 SSR LEXIS 8, *4, 2000 WL 1898704, *2. However, administrative law judges do not base their step 5 findings exclusively on an independent review of the DOT. At the hearing level, where complex vocational issues exist, vocational expert testimony is required. Judges therefore call upon vocational experts and expect that they will relate their opinions regarding work in the national economy in reference to the classifications and definitions supplied in the DOT.

At times, the opinion of a vocational expert will conflict with what is stated in the DOT. Social Security Ruling 00-4p explains that a judge should not rely on vocational expert testimony that conflicts with the DOT, unless the judge first obtains a reasonable explanation from the vocational expert that resolves or explains the basis for the conflict. 2000 SSR LEXIS 8, *4-5, 2000 WL 1898704, *2. Discerning whether a conflict exists is not always clear. In this case the

vocational expert testified that his testimony was consistent with the DOT. (R. 55.) However, a conflict is clearly indicated in this case by the Judge's specification of no reading or spelling, versus definitions calling for some reading and/or writing.[11] Consequently, Richardson's step 5 challenge raises another basis for remand.

## Conclusion

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court vacate the Commissioner's decision and remand for further proceedings consistent with the foregoing discussion.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 29, 2011

---

[11] Two of the six identified occupational codes refer to level 1 reading demands, which is the lowest level. Possibly these jobs would not require any reading. However, four of the identified occupational codes refer to either level 2 reading demands or else specifically indicate reading or writing in the definition.